DANIEL BERKO (94912)
819 Eddy Street
San Francisco, CA 94109
Telephone: (415) 771-6174
Fax: (415) 474-3748
E-mail: berkolaw@sbcglobal.net

MICHAEL VON LOEWENFELDT (178665)
DANIEL A. ZAHEER (237118)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500
E-mail: mvl@kerrwagstaffe.com
E-mail: zaheer@kerrwagstaffe.com

Attorneys for Plaintiff
JASON TOY and CHEIDU NWAMUO on
behalf of themselves and all others similarly
situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JASON TOY and CHIEDU NWAMUO, on behalf of themselves and all others similarly situated, | Case No. 10-cv-1929 (SI) |
| | **SECOND AMENDED COMPLAINT FOR DAMAGES** |
| Plaintiffs, | |
| | **CLASS ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| TRIWIRE ENGINEERING SOLUTIONS, INC., COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS MANAGEMENT LLC and DOES 1 THROUGH 60 inclusive, | |
| Defendants. | |

KERR
&
WAGSTAFFE
LLP

Plaintiffs JASON TOY and CHIEDU NWAMUO complain as follows:

1.      Defendants TRIWIRE ENGINEERING SOLUTIONS, INC. ("TRIWIRE"), COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC and Does 1 through 60 employed JASON TOY and CHIEDU NWAMUO as cable technicians to install, disconnect, and upgrade cable television, voice and data services for consumers who use the services and equipment of COMCAST, a provider of cable television, voice and data services to consumers throughout California.

2.      Plaintiffs do not know the true names of Defendants DOES 1-60 inclusive, and therefore sue them by those fictitious names.  Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of those defendants was in some manner legally responsible for the events, happenings, injuries and damages alleged in this complaint. Plaintiffs are informed and believe and thereupon allege that each of the Does 1-60 and all named Defendants, and each of them, encouraged, supported, aided, advised, agreed upon and abetted the violations that are alleged in this complaint.

3.      In this complaint when reference is made to any act of TRIWIRE such allegations shall mean that the owners, officers, directors, agents, employees or representatives of TRIWIRE authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

4.      In this complaint when reference is made to any act of COMCAST CORPORATION and/or COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC (hereafter collectively and individually "COMCAST") such allegations shall mean that the owners, officers, directors, agents, employees or representatives of COMCAST authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.  Comcast Corporation is believed to be a Pennsylvania corporation doing business in the

State of California, County of San Francisco. Comcast Cable Communications Management, LLC, is believed to be a limited liability company doing business in the State of California.

5.     Plaintiffs are informed and believe and thereupon allege that COMCAST is a joint employer of Plaintiffs and all class members as alleged herein because the class members are performing essential functions of COMCAST's business, COMCAST has significant power over their working conditions, the class members are understood by the public to be representing COMCAST, all or substantially all of the equipment installed by class members is COMCAST equipment and Plaintiffs are informed and believe that the contract between TRIWIRE and COMCAST by which TRIWIRE agrees to have its technicians represent COMCAST and install COMCAST services in customer's homes dictates that TRIWIRE is to receive insufficient funds for its technicians to be paid in conformity with California and federal law.  Moreover, COMCAST knows, or should know, that TRIWIRE acts in violation of California Labor laws in its agreements with all class members yet continues to encourage and enable TRIWIRE to underpay its workers and continues to pay TRIWIRE the monies necessary to allow TRIWIRE to continue profiting by violating the law and depriving class members of their lawful rights. TRIWIRE acts in close concert with COMCAST in supervising class members. COMCAST and TRIWIRE acting jointly reserve the right to refuse the right to pay for class members' work unless the work is done to the satisfaction of COMCAST.

6.      Moreover, by shifting responsibility for the installation of COMCAST equipment and services to TRIWIRE and knowingly allowing TRIWIRE to systematically underpay its cable technicians including plaintiff and all class members, COMCAST was able to unfairly compete in the marketplace by reducing the true costs of installing and servicing its equipment through the use of laborers paid less than lawful wages.

7.     Defendant COMCAST was the employer, joint employer, common law employer and/or employer in fact of plaintiffs and of all persons similarly situated to plaintiffs. COMCAST exercised control over the wages, hours and working conditions of plaintiffs, suffered and permitted plaintiffs to work and engaged plaintiffs such as to create a common law employment relationship.  On information and belief, COMCAST:

a.      had the power to prevent class members from working;

b.      had the power to hire and fire class members;

c.      exercised control over the wages, hours and working conditions of class members;

d.      through its agreements including but not limited to its Preferred Vendor Agreement For Broadband Installation/Disconnection/Construction with TRIWIRE and exhibits thereto, including an Exhibit entitled "Minimum Standards and Expectations," exercised control over the wages, hours and working conditions of class members and exercised authority to hire, fire and prevent class members from working;

e.      ordered, caused and/or directed that all class members wear identification badges provided by COMCAST and identifying class members as representatives of COMCAST, where issuance of such badges was conditioned upon the class members' completion of certain pre-authorization criteria to COMCAST's satisfaction, where issuance of such badges was within COMCAST's sole discretion, and where COMCAST required that such badge authorization be renewed on a regular basis;

f.      ordered, caused and/or directed that each class member must wear the most recent identification badge issued by COMCAST;

g.      ordered, caused and/or directed that identification badges will include a photograph of the class member, the class member's name and "other information as determined by" COMCAST;

h.      ordered, caused and/or directed that class members' employment be conditioned upon the class members' satisfaction of prerequisites chosen by COMCAST for the issuance of such identification badges;

i.      ordered, caused and/or directed that class members' employment be conditioned upon their maintaining a "professional, consistent appearance," as defined by COMCAST, including COMCAST's



1    "Branding and Identification Requirements";

2    j.    ordered, caused and/or directed that class members wear employee

3          uniforms while working, that such uniforms contain a prominently

4          displayed COMCAST logo designated and approved by COMCAST, and

5          that such uniforms contain the class member's name on the left sleeve;

6    k.    ordered, caused and/or directed that class members' uniforms be supplied

7          only by COMCAST's pre-approved vendors;

8    l.    ordered, caused and/or directed that class members wear collared short-

9          sleeved polo shirts or long-sleeved denim shirts at all times;

10   m.    prohibited class members from wearing T-shirts unless covered by a

11         COMCAST approved collared shirt;

12   n.    ordered, caused and/or directed that class members wearing a polo shirt

13         must wear a solid-colored polo shirt;

14   o.    ordered, caused and/or directed that class members wear clean and full-

15         length pants without holes, tears or ragged edges, and that such pants must

16         be blue or black denim, or blue, black or tan work pants;

17   p.    ordered, caused and/or directed that class members may only wear a cap if

18         such cap contained a COMCAST approved logo or was undecorated, and

19         that any cap worn contain no other illustration, name, logo, brand identity

20         or description;

21   q.    ordered, caused and/or directed that vehicles used by class members while

22         working be identified by a COMCAST logo designated and approved by

23         COMCAST;

24   r.    ordered, caused and/or directed that vehicles used by class members

25         display COMCAST signage in accordance with COMCAST's approved

26         graphic manual, and that the make, model, mileage and overall condition

27         of the vehicle be approved by COMCAST;

28   s.    ordered, caused and/or directed that vehicles used by class members "have



1    professional appearance, and shall not have excessive damage or excessive

2    dirt" and that COMCAST's preferred color of vehicle is white;

3    t.    ordered, caused and/or directed that class members' employment be

4    conditioned upon the results of regular background checks, background

5    verifications, criminal history checks and/or drug screening tests;

6    u.    ordered, caused and/or directed that class members' employment be

7    conditioned upon the class member not having been convicted of a

8    misdemeanor offense (without any limitation as to the date of the

9    misdemeanor, the type of misdemeanor, whether the misdemeanor was

10   committed when the individual was a juvenile or whether the

11   misdemeanor had been expunged) unless COMCAST's prior written

12   approval was obtained;

13   v.    ordered, caused and/or directed that class members' employment be

14   conditioned upon the class member not having been convicted of a felony,

15   not having been included on any "terrorist watch list," not having been

16   included on "any sex offender registry," unless COMCAST's prior written

17   approval was obtained;

18   w.    ordered, caused and/or directed that class members' employment be

19   conditioned upon validation of the class member's driver's license and

20   license classification to the satisfaction of COMCAST;

21   x.    ordered, caused and/or directed that the background checks and drug tests

22   previously referenced be conducted by a firm specifically chosen and

23   authorized by COMCAST;

24   y.    ordered, caused and/or directed that class members "that fail the drug

25   screening are not permitted to perform any Work" for COMCAST or on

26   COMCAST's behalf;

27   z.    ordered, caused and/or directed that said drug screening at a minimum

28   include a "5-PANEL DRUG SCREEN" for all class members, and that

1   such screening be done for Amphetamine, Cannabinoids, Cocaine

2   Metabolite, Opiates and PCP;

3   aa.   on information and belief, had the power to cause class members to be

4   terminated from employment if they were not able to prove valid

5   immigration status to COMCAST's satisfaction;

6   bb.   ordered, caused and/or directed that class members employment be

7   conditioned upon the class members' passage of certain examinations of

8   the class members' competency, for which COMCAST defined the

9   parameters, including a specific minimum passage rate;

10   cc.   ordered, caused and/or directed that class members' employment be

11   conditioned upon the class members being "certified at a minimum in

12   Video competency and otherwise at the level required to perform" cable

13   installation, disconnection and similar services for COMCAST's

14   customers "in a satisfactory manner";

15   dd.   ordered, caused and/or directed that TRIWIRE should not allow, and that

16   COMCAST would not allow any class member "to perform a job for

17   which he or she is not certified in accordance with an industry certification

18   program provided by a third party and approved by" COMCAST;

19   ee.   ordered, caused and/or directed that certification program required by the

20   contract was managed by COMCAST-approved vendor Jones/NCTI, Inc.;

21   ff.   ordered, caused and/or directed that compliance with the certification

22   requirement discussed above be confirmed through submission of a

23   confirmation document containing at least the class member's name, the

24   type of certification completed and the applicable dates of certification;

25   where such confirmation document was a condition of and prerequisite to

26   the class member's employment;

27   gg.   ordered, caused and/or directed that class members use COMCAST

28   equipment in the performance of their work;



hh.   ordered, caused and/or directed that, at least for a portion of the time class members were performing services for COMCAST and its customers, that class members report to a COMCAST warehouse on each day of work;

ii.   ordered, caused and/or directed that class members appear for work at a COMCAST or TRIWIRE warehouse before going to perform services at a COMCAST customer's residence or business;

jj.   ordered, caused and/or directed that TRIWIRE "must provide trained supervisors at all locations at a minimum rate of one (1) supervisor to ten (10)" class members;

kk.   ordered, caused and/or directed that all TRIWIRE "representatives who have the authority to direct manpower and make staffing decisions must be available 24 hours a day, 7 days a week" to COMCAST;

ll.   ordered, caused and/or directed that TRIWIRE maintain facilities capable of monitoring all activity performed by class members and provide such information to COMCAST on a real time basis;

mm.   required that TRIWIRE and/or class members notify COMCAST when class members arrived at and departed from a job location and notify COMCAST of all equipment installed during the job;

nn.   maintained ultimate control over class members' daily work assignments;

oo.   ordered, caused and/or directed that TRIWIRE make class members available to perform services for COMCAST and for COMCAST's customers, including but not limited to installations, relocates, reconnects and disconnects, on the days and at the times required by COMCAST;

pp.   ordered, caused and/or directed that TRIWIRE respond to COMCAST's requested performance program requirements within 30 days of a request;

qq.   had the authority to audit TRIWIRE's facilities, payroll and work;

rr.   ordered, caused and/or directed that class members' work be performed according to COMCAST's quality control guidelines, that class members'

1    compliance and/or non-compliance with such guidelines be checked on a

2    regular basis and that the results of such checks be provided to

3    COMCAST on a weekly basis;

4    ss.    maintained control over class members' work schedules, including class

5          members' days off;

6    tt.    maintained control over the scheduling of work performed by class

7          members, including the scheduling of cable, voice and data service

8          installation during particular windows of time, where such scheduling

9          procedures are substantially similar to the procedures COMCAST

10         employs with regard to its in-house installation technicians;

11   uu.    determined on a daily basis and dictated to TRIWIRE and to class

12         members whether or not there would be any work for class members at all;

13   vv.    monitored and supervised class members' work and schedules using the

14         Minuteman, Scout and/or Mindshare programs;

15   ww.    ordered, caused and directed that class members comply with

16         COMCAST's "on-time guarantee" and that class members who do not

17         comply with that guarantee to COMCAST's satisfaction be penalized in

18         terms of their compensation;

19   xx.    performed quality control of class members' work, including by sending

20         COMCAST employees to customers' homes and businesses to review

21         quality of class members' work,

22   yy.    ordered, caused and/or directed that class members perform work "in a

23         good, professional and workmanlike manner, in strict accordance with . . .

24         standard construction practices that are customary in the cable television,

25         broadband distribution and telephony industries," as well as in accordance

26         with COMCAST's contractual requirements;

27   zz.    required that TRIWIRE immediately notify COMCAST in writing if it, or

28         any class member, believed that any part of any work done for



1  COMCAST or COMCAST's customers violated any law or legal

2  requirement;

3  aaa.  required that TRIWIRE provide, by fax, all route sheets reflecting routes

4  driven by class members on a daily basis prior to such work being

5  completed;

6  bbb.  required that TRIWIRE advise COMCAST in a timely manner of the class

7  members' completion of each COMCAST work order, including the

8  COMCAST's completion code;

9  ccc.  required that COMCAST-designated "Key Personnel" supervise all work

10  done by class members, and that such "Key Personnel" could not be

11  removed, replaced or reassigned without COMCAST's prior written

12  consent;

13  ddd.  required that such "Key Personnel" devote a minimum of 85% of their

14  professional efforts on behalf of TRIWIRE to effectuate TRIWIRE's

15  obligations to COMCAST;

16  eee.  required that such "Key Personnel" meet with COMCAST on a monthly

17  basis to review work performed by class members and issues related

18  thereto;

19  fff.  required that TRIWIRE "accept no other work or enter into no other

20  contract that will interfere with the progress of any" COMCAST statement

21  of work;

22  ggg.  ordered, caused and/or directed that class members perform work

23  according to COMCAST's "Specifications," including but not limited to

24  COMCAST's construction, engineering and installation procedures and

25  manuals and related documents and bulletins;

26  hhh.  regularly issued safety bulletins and other information to class members,

27  which governed the manner in which class members were to perform their

28  job duties;

iii.    provided detailed parameters, requirements and instructions regarding how class members' jobs are to be performed, including for example when and how to confirm with a customer that a dial tone exists, and when and how to explain to the customer how to operate COMCAST equipment;

jjj.    received, kept, maintained and/or had access to class members' employment records and/or information;

kkk.    knowingly and intentionally benefitted from labor provided by class members;

lll.    exercised direct and indirect control over class members' wages, including by setting forth specific compensation rates for particular work done;

mmm.  maintained authority to audit class members' payroll records;

nnn.    ordered, caused and/or directed that class members collect money from COMCAST's customers on COMCAST's behalf;

ooo.    ordered, caused and/or directed that class members enter into written contracts with COMCAST customers on behalf of COMCAST; and

ppp.    ordered, caused and/or directed, pursuant to COMCAST's substantial and ubiquitous control over class members' employment and of TRIWIRE's operations, that all or substantially all of the class members' employment be terminated in or about May 2009 after COMCAST directed that it would no longer employ technicians working with TRIWIRE.

8.    Plaintiffs bring this action on their own behalf, and on behalf of all persons similarly situated.  The class plaintiffs represent consists of all persons who were employed by TRIWIRE in California as cable television and computer technicians who install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of COMCAST.

9.    Plaintiffs TOY and NWAMUO worked as cable technicians, were not exempt from overtime requirements, and were not paid overtime in accordance with the law.  Plaintiff TOY was employed from on or about January 2009 through April 2009.  Plaintiff NWAMUO

was employed from September 2007 through December 2007 and from January 2009 through May 2009.

10.     Plaintiffs TOY and NWAMUO worked solely on COMCAST jobs.  They had badges issued by COMCAST without which they could not work, were understood by the public to be COMCAST employees, entered into binding written agreements with the public in which they acted as direct agents in fact for COMCAST, and executed contracts as COMCAST'S "company representatives" creating a direct employee/agent relationship between them and COMCAST.  They were required to complete training to COMCAST specifications, were required to wear COMCAST approved clothing, and installed only COMCAST equipment. They were required to pass a COMCAST approved background and drug test.

11.     NWAMUO and TOY were paid piece rate based on the piece rate schedule between Comcast and TRIWIRE. Their pay was subject to chargebacks if work they performed was deemed to be not up to COMCAST standards.  NWAMUO and TOY were charged for COMCAST equipment mislaid or unaccounted for, and were required to comply with COMCAST'S on time and new customer guarantees to its customers.

12.     NWAMUO and TOY only received work if in the sole discretion of COMCAST it chose to give work to TRIWIRE.  On information and belief, their work was supervised or quality controlled by Comcast or by TRIWIRE acting on behalf of COMCAST.  They had work added to their jobs as a result of communications between COMCAST clients and COMCAST. They were required to notify COMCAST of the status of every job, the start and stop time, upon arrival at and especially upon leaving every job.  Information about their work was recorded into a COMCAST owned or licensed data base including listing any equipment they used on the job, and, on information and belief, the time the job started and the time the job ended.  NWAMUO, TOY, and other techs had days off cancelled upon the direction and command of COMCAST. NWAMUO'S and TOY's jobs were terminated solely because COMCAST cancelled its contract with Triwire.

13.     COMCAST and TRIWIRE thus both suffered and permitted NWAMUO and TOY to perform work essential and integral to COMCAST'S and TRIWIRE'S business model

KERR
&
WAGSTAFFE
LLP

1    when they knew, or should have known, they were not being paid overtime wages due to them.

2         14.    NWAMUO and TOY are not certain of the exact manner in which their pay was

3    calculated.  NWAMUO received pay stubs which did not indicate hours worked but simply

4    stated a flat amount of payment for the period and stated 0.00 regular hours and 0.00 overtime

5    hours worked.  The paystubs purported to state an amount of money due based on a piece rate

6    formula which NWAMUO is informed and believes gave no premium wages for work over 8

7    hours in a day or 40 in a week.  Even though his wage stub stated he worked no hours, in those

8    weeks he often worked over 40 hours in the week and more than 8 hours in the day.

9         15.    At times, TRIWIRE purported to pay a premium wage to NWAMUO and TOY

10   but did not calculate it properly or fully and at other times it paid no premium wage at all.

11   TRIWIRE failed to provide NWAMUO and TOY with an accurate printout of the pieces which

12   they completed in each week.  In addition, they were not paid for all hours worked and/or show

13   up time as required by California law for times when they reported to work and none was

14   available to them.  NWAMUO and TOY also did not receive their last paychecks. NWAMUO

15   was paid a set amount of expenses per work week without regard for the amount of actual

16   expenses incurred and which NWAMUO is informed and believes did not compensate him for

17   his expenses.

18        16.    There are well-defined common of questions of law and fact affecting the class

19   plaintiffs represent. The class members' claims against Defendants involve questions of common

20   and general interest in that each and every one of the class members including TOY and

21   NWAMUO:

22             a.    Were not paid overtime consistent with federal and state wage and hour

23                   laws as a matter of company-wide policy;

24             b.    Did not receive authorized and paid rest and meal breaks as a matter of

25                   company-wide policy;

26             c.    Paid the expenses of the employer and were not reimbursed for those

27                   expenses as a matter of company-wide policy.  Unreimbursed expenses

28                   included but were not limited to, gas, cell phone bills, tolls, parking

tickets, insurance, or vehicle repairs and maintenance or damage all of
which involved or was incurred while working for TRIWIRE;

d.   As a matter of companywide policy were not paid for hours worked prior
to a class member's arrival at the first customer location, where such
unpaid time included time in which class members were required to
appear at a warehouse in the morning to obtain equipment and job
assignments and time spent driving to the first customer location;

e.   Class members maintain that defendants' companywide policy of not
paying them until they arrive at a consumer's location is a willful,
intentional, and knowing violation of California law.

f.   Class members maintain that they started work no later than arrival at a
warehouse for work or when they left their homes;

g.   Were affected by a company-wide policy that refused to pay "show-up
time" for putative class members who appeared for work but did not
receive at least four hours of wages;

h.   Were affected by a companywide policy which refuses to pay split shift
premium even when due;

i.   Were subjected to a companywide policy of being refused lawfully earned
and due wages because of matters beyond the class member's control such
as the failure of a consumer to sign a work order and further may have
been subject to wage deductions or charge-backs as a punishment
therefore;

j.   Were subject to a companywide policy that arbitrarily refused to pay for
work performed due to alleged defects in the work and further may have
been subject to wage deductions or charge-backs as a punishment
therefore;

k.   Were subject to a companywide policy in which the hours worked and
overtime calculation did not comply with the law and resulted in class

KERR
&
WAGSTAFFE
LLP

members being undercompensated;

l.    Were affected by a companywide policy by which monetary punishments were exacted upon the class members, subjecting them to chargebacks which money was converted by the Defendants to profits;

m.    Were affected by a company-wide policy which maintained that they were not due payment for time spent in mandatory weekly staff meetings, safety meetings and other meetings;

n.    Were subject to a companywide policy of paychecks from TRIWIRE with wage stubs that TRIWIRE deliberately failed and intentionally caused to not state the days and hours worked and/or to accurately set forth the number of pieces of work performed within the pay period;

o.    Were knowingly and intentionally not paid at termination of employment all monies due to them;

p.    Were subject to a company-wide policy wrongfully charging them for equipment mislaid and for property damage accidentally incurred in carrying out the job duties;

q.    Were affected by the company-wide policy of knowingly and intentionally failing and refusing to reimburse the employees for wage deductions made for tools and equipment returned at the termination of employment, as well as interest due on such sums;

r.    Were required or coerced to purchase goods, equipment and services from the Defendant, including Nextel radio service;

s.    Would mutually benefit from liability being found as against all defendants for all claims;

t.    Are subject to all of the same defenses that Defendants will assert;

u.    Have an identical interest in the success of the legal theories being asserted;

v.    Will benefit from having the claims asserted as a class action;

w.   Have an identical interest in demonstrating the liability of each and every defendant;

x.   Will prove the liability of each and every defendant due to his or its personal connection to the wrongdoing utilizing identical or nearly identical evidence in support;

y.   Claim identical or nearly identical types of damages and penalties;

z.   Every class member has identical facts supporting his claim that COMCAST should be liable for his or her damages; and

aa.   COMCAST has identical facts supporting all of its defenses as against all class members.

17.   Accordingly, the facts supporting the claim for each class member are identical or substantially similar for Plaintiffs TOY, NWAMUO, and each member of the class and the alleged breach and claim of liability is identical or substantially identical for each member of the class. These questions are such that proof of a state of facts common to the class representatives and to members of the class will entitle each member of the class to the relief requested in this complaint.

18.   Plaintiffs will fairly and adequately represent the interests of the class, because plaintiffs are members of the class and plaintiffs' claims are typical of those in the class.

## FIRST CAUSE OF ACTION

### (VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200)

### (AGAINST ALL DEFENDANTS)

19.   Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1-18 above.

20.   Business and Professions Code §17200 *et seq.* prohibits any business from engaging in unfair competition which it defines as any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising including any act prohibited by Business and Professions Code §17500.

21.   TRIWIRE's  refusal to pay class members, including TOY and NWAMUO, the

1    wages and benefits due to them as alleged herein, which conduct was done in concert and

2    pursuant to agreement with COMCAST, was aided, abetted, supported and encouraged by all

3    defendants, and each are separately and collectively unfair and unlawful business practices.

4         22.    On information and belief, TRIWIRE and COMCAST engaged in unlawful,

5    unfair, deceptive, misleading and/or fraudulent business practices as well as other conduct in

6    violation of section 17200, including but not limited to the following practices, each of which

7    was applied to TOY, NWAMUO, and the other class members:

8         a.  TRIWIRE and COMCAST failed to pay all wages due.

9         b.  TRIWIRE and COMCAST failed to pay overtime due under Labor Code § 510

10            and §1198 in conjunction with Wage Order 4-2001 and 29 U.S.C. §§ 202 et seq.

11        c.  TRIWIRE and COMCAST failed to pay for all time spent working while class

12            members were employed by TRIWIRE.

13        d.  TRIWIRE and COMCAST failed to reimburse for all expenses incurred in the

14            course of class members' employment.

15        e.  TRIWIRE and COMCAST failed to pay a split shift or show up premium when

16            required by law.

17        f.  TRIWIRE and COMCAST willfully failed to pay all monies due at the

18            termination of employment.

19        g.  TRIWIRE and COMCAST made illegal deductions including requiring or

20            coercing class members to purchase goods and services from the employer

21            including Nextel radio service, and failed to pay interest on any bonded sums.

22        h.  TRIWIRE and COMCAST made illegal "chargebacks."

23        i.  TRIWIRE and COMCAST deducted from class members' compensation amounts

24            earned and paid, but which COMCAST determined on a post-hoc basis that the

25            work for which the compensation was paid did not meet COMCAST's quality

26            control guidelines, "on-time guarantee" or other similar requirements.  Such

27            deductions were made even when compliance with such guidelines and

28            requirements was beyond the control of the class member and therefore an

economic risk that could not be legitimately shifted from the employer to the employee.

j.  TRIWIRE and COMCAST unlawfully shifted other economic risks to the class members in other deductions, non-reimbursements and chargebacks.

k.  Pursuant to a companywide policy in effect at least in 2007, class members did not clock in and out of work and TRIWIRE did not employ any other means to accurately record the amount of time worked by class members.

l.  Instead, TRIWIRE paid class members according to a pure piece rate compensation system in which work time not constituting piece work was not compensated.

m.  By failing to monitor the hours worked by class members, TRIWIRE failed to adequately compensate class members for overtime hours, including hours worked in excess of eight or twelve hours in a work day and hours worked in excess of forty hours in a work week.

n.  TOY and NWAMOU, as well as other class members, regularly worked more than eight hours per day, but were not provided proper overtime compensation for that work.

o.  On information and belief, pursuant to a companywide policy in effect at least in 2007, TRIWIRE did not pay overtime in addition to the piece rate.  To the extent that TRIWIRE's records purport to contain payments for overtime, such records are the result of TRIWIRE's illegitimate calculation method which was used to lower the rate of piece rate compensation on a post-hoc basis, in order to create the appearance that overtime was being paid.

p.  Pursuant to a companywide policy in effect at least in 2007, class members were on multiple occasions not permitted to take meal breaks when working more than 5 hours.

q.  Pursuant to a companywide policy in effect at least in 2007, class members were not provided with paid rest breaks when working more than 4 hours.  If the class

KERR
&
WAGSTAFFE
LLP

1    members, including NWAMUO and TOY, took a rest break it was

2    uncompensated.

3      r.   Pursuant to a companywide policy in effect at least in 2007, class members were

4        required to appear at work on days in which no work was available, and on such

5        days class members would be sent home after spending 1-2 hours at work.  Class

6        members were not paid for such show-up time.  On some days when class

7        members were sent home, they were called back to work in order to perform a

8        job.  Nevertheless, they were not paid for the time in which they showed up but

9        were sent home.

10     s.   On information and belief, class members were not paid the regular hourly rate or

11       minimum wage for time spent travelling to and from and waiting at a customer

12       location, when the class members were not able perform the scheduled work at

13       such location due to factors beyond the control of the class members.  For

14       example, class members would go to a scheduled job at a residence, but the

15       customer was not present to provide the class member admittance in order to

16       perform the job.  In such circumstances, the class member was not paid the

17       regular hourly rate or minimum wage for the work time spent at the location or

18       travelling to and from the location.

19     t.   Class members including NWAMUO and TOY attended mandatory staff

20       meetings, safety meetings, and other meetings, but TRIWIRE failed to pay

21       compensation for such attendance.  Instead class members' compensation was

22       limited to a piece rate compensation system that does not compensate for time

23       spent at mandatory meetings.

24     u.   Pursuant to a companywide policy in effect at least in 2009, class members were

25       required to clock in to work when arriving at the warehouse in the morning.

26       However, class members were not provided with a reasonable means to clock out.

27       For this reason and due to other actions of TRIWIRE, the work time records kept

28       by TRIWIRE during this period do not accurately reflect the time worked by the

1    class members and systematically undercount such work time.

2    v.  Pursuant to a companywide policy in effect at least in 2009, class members were

3    required to clock in to work when arriving at the warehouse in the morning before

4    travelling to the first COMCAST customer location of the work day.  Class

5    members were not paid for the time spent in the warehouse between the time they

6    clocked in and the time when the first job of the day began.

7    w.  On information and belief, TRIWIRE did not employ a lawful method of

8    calculating class members' compensation, hours and overtime compensation, but

9    rather employed a false calculation method in which the piece rate paid for

10    particular work was manipulated on a post hoc basis in order to create the

11    appearance that class members were being compensated for overtime.

12    x.  Even assuming TRIWIRE did employ a lawful calculation method, because

13    TRIWIRE did not accurately record the hours worked and the hours spent

14    performing piecework as alleged herein, it systematically undercompensated class

15    members for overtime work performed.  For example, by requiring that class

16    members clock into work prior to beginning the first job at a COMCAST

17    customer location, TRIWIRE artificially inflated the denominator used in

18    calculating the "regular hourly rate" paid for piece work (calculated as the total

19    weekly compensation earned for piece rate work divided by the total number of

20    hours spent on such piece work).  Accordingly, the "regular hourly rate" was

21    calculated as less that the true "regular hourly rate," resulting in an under-

22    compensation of overtime (calculated as the regular hourly rate, multiplied by .5

23    or 1, multiplied by the number of overtime hours worked).  Furthermore, because

24    the number of overtime hours worked was also artificially reduced, that too

25    resulted in under-compensation of overtime.

26    y.  Class members were required to report to the warehouse for equipment audits by

27    Comcast but TRIWIRE failed to pay compensation for such attendance.  Instead

28    class members' compensation was limited to a piece rate compensation system

1    that does not compensate time spent at such meetings.

2    z.   TRIWIRE deducted monies from class members' compensation, including

3         NWAMOU's, based upon equipment purportedly lost due to the class members'

4         negligence or due to factors beyond the control of class members. For example,

5         TRIWIRE would regularly review class members' "CPE Buffer" and would

6         impose a payroll deduction for equipment TRIWIRE determined to be missing

7         (but in some cases was not missing) such as deducting $99 for the cost of a

8         purportedly lost modem.

9    aa.  TRIWIRE reimbursed class members including NWAMUO and TOY for vehicle

10        and transport related expenses using a lump-sum method, where the amount paid

11        was insufficient to provide full reimbursement for actual expenses necessarily

12        incurred. For example, plaintiff NWAMUO received $66 per pay period for

13        vehicle related expenses, but that amount did not cover even his gasoline costs

14        (much less vehicle maintenance, insurance and depreciation) which sometimes

15        involved filling the tank more than two times a week depending on the route

16        driven.

17   bb.  TRIWIRE maintained a lump-sum method of vehicle reimbursement where such

18        method was not used to estimate the actual amount of vehicle expenses or to

19        correlate the reimbursement to the actual expenses incurred but, in light of the

20        substantial day-to-day variations in the amount driven, was used to systematically

21        underpay class members and to unlawfully shift vehicle and transport expenses to

22        the class members.

23   cc.  Class members were not reimbursed for equipment, supplies, phones, phone

24        expenses and tools that were necessary for the performance of their job duties and

25        TRIWIRE deducted the cost of equipment, tools and/or supplies from class

26        members' compensation, including NWAMUO.

27   dd.  Prior to their termination, class members including NWAMUO cleaned out the

28        warehouse used by TRIWIRE. Class members were not paid for such work.

ee.  TRIWIRE and COMCAST engaged in other improper deductions or reductions from money due.

ff.  TRIWIRE and COMCAST committed other failures to pay money due.

23.     Each class member is entitled to restitutionary damages and disgorgement of wrongful profits.

24.     To the extent that Defendants, and any of them, received greater profits from their business or money from TRIWIRE and COMCAST's operations than they otherwise would have had Defendants obeyed California and United States labor laws, Defendants and Does 1-60 must disgorge all such profits and money in order to pay Plaintiffs the money owed to them. Among the laws violated by Defendants and does 2-60 are California Constitution Article XV, §1, California Labor Code 201, 203, 204, 206, 206.5, 208, 210, 216, 221, 223, 226, 226.7, 402-404, 432.5, and 450, 510, 512, 558, 1174, 1194-1194.2, 1197.1, and 1198, 1199, 1199.5 2802, (2) 29 USC 202, 206-207, 216, 8 Cal.C.Regs. §§ 11010–11150, 11160 ¶ 4(c)(4), 29 CFR §§ 541.0 et seq., 778.100-778.101, 778.217, 778.220-223, 778.501 -503 785.17, 785.24-785.25.  Plaintiffs reserve the right to seek leave to amend this complaint to allege additional laws violated as appropriate.

25.     TRIWIRE and Does 1 through 60 fail to pay overtime to class members even though they have actual knowledge that class members are entitled to overtime for each workweek that they work over forty hours in a week and for each day that they work over eight or twelve hours in a day and anytime on the seventh day.  TRIWIRE failed to account for all hours worked by class members including necessary preliminary and postliminary activities, as well as engaged to wait time.

26.     TRIWIRE'S failure to pay overtime due to class members was a willful violation of Federal and State overtime payment requirements because Defendants should have known and would have known had they not recklessly ignored the requirements of Federal and State overtime laws that the class members were not exempt from overtime requirements and yet they failed to pay overtime.

1

## SECOND CAUSE OF ACTION

2

**(LATE PAYMENT OF WAGES PURSUANT TO LABOR CODE §201-203)**

3

**(AGAINST TRIWIRE AND DOES 1-60)**

4
27.    Plaintiff incorporates herein all of the allegations, averments and matters

5
contained in paragraphs 1-18, inclusive as if set forth at length herein *in haec verba*.

6
28.    Defendant and Does 1-60 and each of them, as to all class members who are no

7
longer employed by TRIWIRE, willfully failed to pay all monies due at the termination of the

8
employment relationship either immediately or within 72 hours, pursuant to Labor Code Section

9
201.

10
29.    On or about April 7, 2009 an employee of defendants died in a workplace

11
accident.

12
30.    Following the fatality, COMCAST reduced the amount of work for class

13
members.  However, even after the amount of work was reduced, class members were still

14
required to report for work.  Class members including NWAMUO and TOY were never paid for

15
such show-up time.

16
31.    Class members including NWAMUO and TOY were also required to attend a

17
meeting at which they were informed that COMCAST would no longer be employing class

18
members,  i.e. that class members were being terminated.  Class members were promised to be

19
paid for the meeting, but such payment was never made.

20
32.    Following the fatality, class members also performed work for TRIWIRE in that

21
they cleaned the warehouse from which TRIWIRE had been operating.  Class members were

22
promised compensation for this work as well, including a two week severance payment.

23
However, class members were not paid for such work.

24
33.    Upon termination class members were not paid the amounts specified above, as

25
well as the overtime, unlawful deductions, unpaid hours, chargebacks, expense reimbursements,

26
show-up time and other amounts owing, as set forth in this complaint.

27
34.    Each class member who is no longer employed by Defendants is entitled to thirty

28
days of pay at the regular daily rate in addition to all other relief sought herein, pursuant to Labor

1    Code Section 203, as well as an award of attorney fees and costs incurred in pursuing this claim.

2                              **THIRD CAUSE OF ACTION**

3              **(FAILURE TO PAY OVERTIME WAGES PURSUANT TO §1198)**

4                              **(AS TO ALL DEFENDANTS)**

5        35.    Plaintiff incorporates by reference all of the allegations, averments and matters

6    contained in paragraph 1 through 18 inclusive as if set forth at length herein in *haec verba*.

7        36.    Defendants failed and refused to pay class members overtime due for time worked

8    in excess of eight hours per day or forty hours per week.  Defendants failed to account for all

9    hours worked by the class members including in necessary preliminary and postliminary

10   activities, as well as engaged to wait time.  Defendants failed and refused to pay class members

11   overtime wages for work performed on the seventh consecutive day of work or for double time

12   for hours in excess of twelve on a daily basis or in excess of eight hours on the seventh day.

13       37.    Labor Code §1198 provides that it is unlawful to employ persons for longer than

14   the hours set by the Industrial Welfare Commission or under conditions prohibited by the

15   applicable wage order.

16       38.    At all times relevant herein, the Industrial Welfare Commission Wage Order No.

17   4- 2001 and Labor Code § 510 applied to the employment of class members by Defendant. Said

18   wage order and Labor Code section provide that any employee employed for more than eight

19   hours a day or forty hours per week are to be paid at the rate of 1.5 times the regular rate for

20   hours in excess of eight per day or forty per week, and for every hour on the seventh or more

21   consecutive day of work, and 2.0 times the normal rate for hours worked over twelve or in

22   excess of eight on the seventh consecutive day of work.

23       39.    Class members including NWAMUO and TOY regularly worked overtime hours

24   and were not paid the proper amount of premium pay due to them.

25       40.    Pursuant to Labor Code 1194(a), Plaintiff and the class are entitled to recover

26   their lost earnings, penalties, and reasonable attorney's fees and costs.

27

28


KERR
&
WAGSTAFFE
LLP

Case No. 10-cv-1929 (SI)                                    SECOND AMENDED COMPLAINT

**FOURTH CAUSE OF ACTION**

**(PRIVATE ATTORNEY GENERAL'S ACT)**

**(AS TO ALL DEFENDANTS)**

41.     Plaintiffs incorporates herein all of the allegations, averments and matters contained in paragraphs 1 through 18 above as if set forth at length *in haec verba*.

42.     Plaintiffs wrote to the Labor and Work Force Development Agency, pursuant to Labor Code §2699 with notice of alleged Labor Code violations.  On December 9, 2009 the Labor and Work Force Development Agency wrote back to Plaintiffs that it did not intend to pursue the alleged violations of the Labor Code.

43.     Pursuant to Labor Code 2699 *et seq*. Plaintiffs seek to recover all penalties permitted for each violation proved of applicable Labor Code sections, including, 201, 203, 210, 510, 512, 558, 1194 1197.1, 1198, and 2802.

**FIFTH CAUSE OF ACTION**

**(VIOLATION OF LABOR CODE 2802)**

**(AS TO ALL DEFENDANTS)**

44.     Plaintiffs incorporate herein all of the allegations, averments and matters contained in paragraphs 1 through 18 above as if set forth at length *in haec verba*.

45.     As discussed in more detail above, while employed by TRIWIRE and COMCAST, and in the direct consequence of their duties and the obedience of instructions by TRIWIRE and/or COMCAST, Class members including NWAMUO and TOY were required to expend their own monies without reimbursement and in addition suffered losses to his or her own property for which Defendants must indemnify class members, including, but not limited to, the operating costs of their vehicles as well as the purchase of industry-specific tools, and were charged back for allegedly lost or mislaid Comcast equipment.

46.     Plaintiffs and the class members are entitled to restitution for the actual expenses incurred by them in furtherance of Defendants' businesses, and interest, costs and attorney's fees incurred in the collection thereof.

KERR
&
WAGSTAFFE
LLP

Case No. 10-cv-1929 (SI)                                    SECOND AMENDED COMPLAINT

1  **WHEREFORE PLAINTIFFS PRAY JUDGMENT AS FOLLOW:**

2  **ON ALL CAUSES OF ACTION:**

3       1. General damages according to proof;

4       2. Special damages according to proof;

5       3. Interest on all sums awarded;

6       4. Costs of suit;

7       5. Such other, and/or further relief as is just and proper.

8

9

10                           **DEMAND FOR JURY TRIAL**

11       Plaintiffs demand trial by jury on all causes of action but the First.

12

13  DATED: September 17, 2010           **KERR & WAGSTAFFE LLP**

14

15                         By         /s/
                          DANIEL A. ZAHEER

16

17                         Attorney for Plaintiffs
                       JASON TOY and CHIEDU NWAMUO on behalf
of themselves and all others similarly situated

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP